UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREAT AMERICAN ASSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY, et al.,<br><br>Defendants. | Case No. 21-cv-01135-RS<br><br>**ORDER DENYING IN PART AND GRANTING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR JUDGMENT ON THE PLEADINGS** |

## I. INTRODUCTION

This dispute among three insurance carriers, all of whom issued policies to the same insured, arises from the notorious sinking and tilting of the Millennium Tower, a residential hi-rise in San Francisco, during and after its construction. The litigation arising from the Millennium Tower construction involved hundreds of parties, multiple cross and countersuits, and a myriad of insurance programs and policies. Over 40 actions were eventually coordinated under a case in San Francisco Superior Court entitled, *Laura S. Lehman v. Transbay Joint Powers Authority, et al.*, Case Number CGC-16-553758. They were then settled globally, under a "double blind" settlement, where parties do not know how much each defendant paid, or how much plaintiffs received in total.

Plaintiff in this case is Great American Assurance Company, which issued a $25 million excess liability policy to Webcor Builders, the general contractor on the Millennium Tower project. During the settlement proceedings, Webcor made a so-called "*Armstrong* election," and

demanded that all of it insurance carriers that had issued policies for the period of June 30, 2008, to June 30, 2009 (the "08-09 Insurance Tower" or "08-09 policy period") contribute their remaining available policy limits to resolve all the claims against Webcor in the coordinated lawsuits.[1] Great American agreed, and paid its $25 million limits.

The Great American policy sat at the "top" of the 08-09 Insurance Tower. Defendant Zurich American Insurance Company issued a primary $1 million policy sitting at the "bottom" of the tower. Defendant Westchester Fire Insurance provided the first level excess coverage over the Zurich policy, with a $25 million limit of liability.

By the time of the settlement, Zurich and Westchester's policy limits had been eroded by defense costs, but they both agreed to pay the remaining policy limits. Two other Webcor insurers, not involved in this litigation, also contributed their remaining policy limits, for a total payment by insurers on Webcor's behalf that approached $100 million.[2] In this action, Great American seeks to recover the $25 million it paid (plus prejudgment interest) under the doctrines of equitable subrogation and/or equitable indemnity. Great American originally asserted a claim for equitable *contribution* as well, but has since agreed to dismiss it as inapplicable on these facts.

Great American, Westchester, and Zurich now each move for summary judgment. An earlier-filed motion brought by Westchester for judgment on the pleadings was heard with the summary judgment motions and is also before the court, although it is effectively subsumed by

---

[1] Great American uses the term "*Armstrong* election" to refer to the California appellate court decision in *Armstrong World Industries, Inc. v. Aetna Cas. & Sur. Co*. 45 Cal.App.4th 1, 49-50 (1996), which is generally understood to give insureds in matters involving continuous losses the right to select a particular policy period for purposes of determining the amount of the deductible and policy limits that apply. As further elaborated by the California Supreme Court in *Montrose Chemical Corp. of California v. Superior Court*, 9 Cal.5th 215 (2020) ("*Montrose III*"), the insured's election does not preclude later reallocation proceedings between or among the insurance carriers. The applicability of *Montrose III* to the facts here is discussed further below.

[2] Despite the fact that all parties agree the settlement amount was to be confidential, Westchester's briefing states the figure, and it submitted no sealing request to have it redacted from the public record. This order will nonetheless avoid stating the exact amount.

Westchester's summary judgment motion. For reasons explained below, the motions by Great American and Westchester will both be denied, and Zurich's motion will be granted.

## II. BACKGROUND

<u>The Millennium Tower</u>

As noted, Webcor was the general contractor for the Millennium Tower construction project. The Millennium Tower comprises three primary structures: a 58-story tower, an adjacent 12-story building on a reinforced concrete podium that includes residences and common areas, and a five-level subterranean garage. The facility includes 419 separate residential condominiums and two commercial units.

The east end of the Transbay Transit Center, a $6 billion public work project, abuts the property to the south. The later-built 350 Mission Street building is across the street, to the north. Webcor was also the general contractor for the 350 Mission Street project. Construction of that building allegedly contributed to the property damage at the Millennium Tower.

Construction of the Millennium Tower started in August of 2005, and the Certificate of Final Completion and Occupancy was issued in August of 2009. The principal thrust of the underlying litigation was that the tower was allegedly erected on an improperly designed and constructed foundation system. The building's foundation was purportedly besieged by other negligent construction practices as well.

By the time construction was completed in mid-2009, the Millennium Tower had already sunk more than 8.3 inches. The tower has since dropped more than another 9 inches, bringing it to a total depth of more than 17 inches. In addition to sinking, allegedly separate and distinct causes have resulted in the building tilting. The floors are now unlevel, and at the top, the Millennium Tower leans more than 14 inches to the west and 6 inches to the north.

The underlying litigation alleged additional categories of damage-causing defects including: (a) misalignment, hardware failure, and air and water transmission relating to the building's "curtain wall"; (b) subterranean water intrusion in the garage and basement; (c) coating

failure and corrosion of aluminum on the building's exterior; and, (d) intra-unit air transmission posing fire and smoke risks. These defects and damages allegedly are unrelated to the sinkage and tilt of the Tower.

### The settlement

The Underlying Litigation was resolved in 2020. To fund Webcor's share of the confidential global settlement, Webcor demanded that all its insurers providing coverage in the 08/09 Policy Period pay their full remaining limits. In response, Zurich paid its remaining limit of $445,806, and Westchester paid $23,000,000 from its 08/09 policy. The Westchester 07/08 policy did not contribute.

Great American agreed to Webcor's demand and paid its $25 million limit under its 08/09 policy pursuant to a reservation of rights. Great American expressly reserved the right to seek reimbursement from insurers that had issued lower-level policies in other policy periods in a "Side Agreement Between and Among Insurers and Risk Financing Entities Relating to the Millennium Tower Litigation Global Settlement" ("the Side Agreement").

The Side Agreement stated: "Released Matters in Section 1.30 of the Global Agreement do not include, among other things, the following: … (9) Any claims for reimbursement solely regarding payments toward the Global Settlement Proceeds made by insurers or risk financing entities of a named insured for equitable indemnity, equitable contribution, or equitable subrogation against other insurers of the same insured." The Side Agreement was signed by representatives of Great American, Zurich and Westchester.

## III. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v.*

*Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id*. at 322-23. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

## IV.  DISCUSSION

A.  <u>Great America's motion for summary judgment</u>

Great America contends Webcor faced liability for property damage caused by at least four separate occurrences: (1) the "subsidence" occurrence; (2) damage to the Tower's "curtain wall"; (3) garage waterproofing-related damages; and (4) additional sink/tilt damages caused by Webcor's "dewatering" of the adjacent construction project at 350 Mission. Great American insists these four occurrences involved separate damage arising from separate causes, but that the "subsidence" occurrence represented the most significant—with repair costs estimated at more than $100 million. Great American expressly bases it motion solely on the "subsidence"

occurrence.[3]

*Applicability of Montrose III*

Great American's basic theory is this: Although Webcor made an *Armstrong* election to demand coverage under the 08-09 Insurance Tower, the first damage from Webcor's alleged negligence was manifest no later than during the 07-08 policy term, which was prior to the time Great American had issued any policy to Webcor. Westchester and Zurich, in contrast, had issued policies in 07-08 and in earlier years. Thus, in Great American's view, it was not actually liable under its policy, and Zurich and Westchester's policy limits had not in fact been exhausted, because they should have paid under other policy years.

Great American contends it acted consistently with the California Supreme Court's direction in *Montrose III*, which it characterizes as teaching "that where a high-level excess insurer believes a claim ought to be paid by a lower-level excess insurer whose policy covers a different period, that high level insurer should first pay the claim and then seek reimbursement from the lower-level insurer." The *Montrose III* decision, however, arose in markedly different circumstances from those presented here.

The backdrop to *Montrose III* included *In Montrose Chem. Corp. of Calif. v. Admiral Ins. Co.,* 10 Cal. 4th 645 (1995) ("*Montrose I*"), in which the California Supreme Court adopted a "continuous trigger" theory of coverage in progressive "long-tail" cases, where damages from an occurrence span multiple policy years, finding all policies in which damage results from a covered occurrence may owe coverage obligations. *Montrose I* then led to *In Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38 (1997), where the court held that under a continuous trigger of coverage analysis, if specified harm is caused by a covered occurrence, and at least some

---

[3] Great American states it does not intend to waive its right to rely on other occurrences as a basis for equitable subrogation or indemnity, and if the present motion fails, it will take the position that "each of the other occurrences should be paid by carriers on the risk in years other than the 08/09 Policy Period."

amount of damage occurs during a policy period, the insurer on that risk is fully liable for all subsequent damage "even if some such harm results beyond the policy period." *Id*. at 57.

In the wake of these decisions, many insurers and the insurance industry generally adopted policy language limiting coverage in long-tail exposure cases, such that the only policy that covers all damage resulting from a continuing occurrence is the policy in force when the damage began. *See, e.g., Pennsylvania Gen. Ins. Co. v. Am. Safety Indem. Co*., 185 Cal. App. 4th 1515, 1525 (2010); *City of San Buenaventura v. Ins. Co. of the State of Penn*., 719 F.3d 1115, 1118 (9th Cir. 2013). Great American asserts that is precisely what the policies do here—the language of these policies places coverage for all subsequent damage caused by an occurrence in the policies in force when damage begins. Great American states: "Accordingly, under the '*Montrose*-exclusion' which is included in each policy at issue in this matter, the only policy period in which coverage can be found for an occurrence that results in continuous or progressively deteriorating damage is the policy in place when damage from that particular occurrence first resulted."

*Montrose III*, in contrast, involved the very policies that gave rise to the *Montrose I* "continuous-trigger" rule. Those policies obviously predated the adoption of the "*Montrose*-exclusion" by insurance companies. The *Montrose III* court identified the issue it was addressing as a "follow-on question" that resulted from prior decisions adopting the "all-sums-with-stacking" approach to the coverage of long-tail injuries. *Id.* at 228. Specifically, the court explained, it was deciding whether under the language of those policies "an insured would be permitted to access any higher layer excess policy once it has exhausted the directly underlying excess policy covering the same period"—so-called "vertical stacking"—or whether instead an insured would be required "to exhaust all of its lower layer excess coverage across all relevant policy periods before accessing any of its higher layer coverage"—so-called "horizontal stacking." *Id.* at 229.

The *Montrose III* court decided vertical stacking was the correct rule:

> In sum, we conclude that in a case involving continuous injury, where all primary insurance has been exhausted, the policy language at issue here permits the insured to access any excess policy for indemnification during a triggered policy period once the directly

underlying excess insurance has been exhausted.

*Id.* at 237.

In explaining why this result was not unfair to excess insurers at the upper levels of the "stack," the court made the observations on which Great America premises its claims:

> Even though a rule of vertical exhaustion permits Montrose to access excess insurance from any given policy period, provided the directly underlying insurance has been exhausted, insurers may seek contribution from other excess insurers also liable to the insured. The exhaustion rule does not alter the usual rules of equitable contribution between insurers. An insurer required to provide excess coverage for a long-tail injury may lessen its burden by seeking reimbursement from other insurers that issued policies during the relevant period.

*Id.* at 236.

The problem for Great American, though, is that this case did not present the vertical vs. horizontal exhaustion issue. *Montrose III* indeed teaches that an excess insurer whose policy is implicated as a result of the vertical exhaustion rule must first pay and then seek reimbursement from other insurers under "the usual rules of equitable contribution." That rule, however, presupposes coverage is generally available given the time period for which the excess policy was issued, and that the only question is whether the attachment point has been reached. There was no dispute in *Montrose III* that policies from *all* the relevant years potentially provided coverage, because of the "all-sums-with-stacking."

Here, Great American quite vehemently insists that there was *no coverage* available for the 08-09 policy period because, it contends, the undisputed facts show property damage began in the 07/08 policy period, and the policy included a "*Montrose* exclusion." Great American argues, "[b]y June 30, 2008, due in part to extended dewatering, the foundation itself was damaged . . . . And not only was the foundation itself damaged—its failing condition was causing additional physical damage to other parts of the structure."

While Webcor may have had a right under *Armstrong* to designate the policy period under which it was making its claim, nothing in either *Armstrong* or *Montrose III* creates *coverage* that

would not otherwise exist—except to the extent that allowing vertical exhaustion rather than horizontal exhaustion could be characterized as expanding coverage. Great American is in a fundamentally different position from the excess insurers in *Montrose III*, who were arguing that their policies had not been implicated *yet*, and might never be if the amounts available under the lower-level policies across all the years proved sufficient. Great American, in contrast, contends its policy would *never* have been implicated, because the damage was manifest before the policy issued. Accordingly, the actual holding of *Montrose III* has no applicability to Great American, and did not require Great American simply to pay first, and seek reimbursement later.

That said, neither does *Montrose III* preclude Great American from seeking recovery on any equitable theory that might otherwise be available. While the primary holding of the case is not implicated by these facts, the court's observation that the "usual" equitable rules remain unaltered leaves recovery under those rules theoretically open to Great American.

*Recovery in equity*

> The case law discussing the three principles of contribution, indemnification and subrogation in the insurance context is surprisingly muddled; courts have often confused the principles, thereby providing a fertile supply of quotations for parties seeking to utilize any one of the three concepts as the need arises. As one California appellate court noted, "[i]t is hard to imagine another set of legal terms with more soporific effect than indemnity, subrogation, [and] contribution . . . ."

*Fireman's Fund Ins. Co. v. Commerce & Indus. Ins. Co.*, 2000 WL 1721080, at *2 (N.D. Cal. Nov. 7, 2000) (quoting *Herrick Corp. v. Canadian Insurance Co.*, 29 Cal. App. 4th 753, 756 (1994)). As explained in *Travelers Indem. Co. of Connecticut v. Hudson Ins. Co.*, 442 F. Supp. 3d 1259, 1268 (E.D. Cal. 2020), however, "distinguishing between these three equitable theories of recovery is of import because, depending on the facts involved in a particular action, a claim brought under the wrong theory may fail as a matter of law."

"[T]]he right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended

the action without any participation by the others." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1293 (1998). As such, the right to equitable contribution arises only when all of the insurance carriers "share the same level of obligation on the same risk as to the same insured." *Id* at 1294 n. 4. Recognizing that condition is not satisfied here, Great American has withdrawn its claim for equitable contribution.[4]

"Equitable subrogation enables one insurer who has paid a debt for which another insurer is primarily liable to sue from the perspective of the insured under the policy on the argument that the second insurer has failed to pay." *Commerce & Indus.,* 2000 WL 1721080, at *3. "In a subrogation claim, the insurer seeking reimbursement from another insurer 'stands in the shoes' of the insured and succeeds only to the rights of the insured." *Id.*

Finally, "[e]quitable indemnification is similar to equitable subrogation in that it also enables an insurer that has paid an obligation which was entirely the responsibility of a co-insurer to place the complete burden for the loss on that other party." *Id.* Because the party seeking reimbursement through indemnification does so in his or her own right (as with a contribution claim), the claim is not subject to the defenses that might apply against the insured. *Id.*

Both in its motion for judgment on the pleadings and its motion for summary judgment, Westchester argues that equitable indemnity is unavailable to Great American on these facts as a matter of law. There is case law to support that argument. *See*, *e.g., Commerce & Indus.,* 2000 WL 1721080, at *3-4 (finding that an excess insurer may not seek reimbursement from a primary insurer through equitable indemnification). More recent authority from a California appellate court, however, declines to read the doctrine so narrowly, and concludes that California law permits its use wherever "one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party." *Travelers Indem. Co. of*

---

[4] The *Montrose III* court specifically used the term "equitable contribution" to refer to an excess insurer's right to seek reimbursement in the circumstances of that case. This would appear to be an example of the "muddle" arising from cases using the various terms imprecisely. In any event, there is no dispute that Great American cannot proceed on an equitable contribution theory.

*Connecticut v. Navigators Specialty Ins. Co.*, 70 Cal. App. 5th 341, 363 (2021). Accordingly, Westchester is not entitled to judgment that Great American is categorically precluded from pursuing an equitable indemnity claim.

Nonetheless, Great American has failed to show that it is entitled to summary judgment in its favor under either equitable indemnity or equitable subrogation. Again, Great American's primary theory is that the damage first occurred no later than during the 07-08 policy period, and that Westchester therefore should have paid under its policy for that time period, and *not* under its 08-09 policy. Even assuming Great American has shown as a matter of law that the damage triggered coverage under the 07-08 insurance tower, it has failed to show that resulted in it paying $25 million that should instead have been paid by Westchester.[5] Rather, if Westchester's payment had been made under the earlier policy, Great American could have asserted the policies under its 08-09 excess policy had not been exhausted and then refused to pay into the settlement, but that would not mean Westchester was obligated to pay an *additional* $25 million. Great American fully embraces the fact that all of the policies involved had *Montrose*-exclusions, such that whatever year's policy properly applied to the subsidence issue, the insurer's liability would be capped at the policy limits for that year.

It is undisputed that Westchester paid $23 million—characterized as the remaining limits under its 08-09 policy. Even if payment should have been characterized as being made under the 07-08 policy instead, the fact would remain that Westchester paid its full policy limits.[6] Great

---

[5] Although the complaint alleges claims for reimbursement against Zurich, in none of its briefing on any of the pending motions does Great American argue that Zurich must reimburse it in any amount or identify any other basis for liability against Zurich. Accordingly, Zurich's motion for summary judgment in its favor must be, and hereby is, granted.

[6] Westchester acknowledges that if payment had been made under the 07-08 policy, an additional $2 million would have been available. It is unclear how Great American could show that its payment effectively "covered" that additional $2 million liability Westchester would have faced if paying under the older policy, such that Great American would be entitled to reimbursement in that amount. Such a claim, however, might be marginally more viable than its assertion to a right for reimbursement of the full $25 million it paid.

American's payment of its own policy limits under the 08-09 policy perhaps could have been avoided had Great American pursued, and prevailed on, its argument that the damage occurred prior to inception of the policy (and was therefore simply not covered, without regard to any exhaustion issues). The payment cannot reasonably be characterized, though, as having been made on obligation for which Westchester was primarily liable, which is an element of both equitable indemnity and equitable subrogation.

Great American offers one argument for imposing on Westchester an obligation to pay more than its policy limits on a one-time basis. Great American points to a mutual release of all claims entered into between Westchester and Webcor.[7] Great American argues that even though that release cannot be used to defeat its own affirmative subrogation claim, it precludes Westchester from relying on the *Montrose* exclusion in its policies to avoid paying under more than one policy year.

Great American has not established a legal or equitable basis to construe the release as opening the door for a third party to impose potentially unlimited liability on Westchester in contravention of the terms of the insurance policy. Furthermore, even if the release did somehow expand Westchester's exposure after-the-fact, it still would not mean the payment made by Great American was for an obligation primarily owed by Westchester.[8]

---

[7] Westchester and Zurich point to the same release to argue the equitable subrogation claim fails, because Great American must "stand in the shoes" of Webcor. Since Webcor has released all its claims, Westchester and Zurich argue, there is nothing left for Great American to pursue. On this point, Great American has the better argument that the release cannot be enforced against it, where Westchester was on notice that Great American would pursue subrogation and where the parties entered a separate agreement specifically preserving subrogation and other equitable reimbursement claims.

[8] Although Great American has failed to show it paid an obligation attaching to Westchester in any event, it is also worth noting that the total costs of repair were estimated to exceed by a large degree the policy limits paid into the settlement. Accordingly, it might not be reasonable to assume if there were a compelling argument that Westchester was obligated to pay more than one policy limit, the demand on Great American would have been proportionately reduced. Rather, the result might have been that all carriers were still required to pay their limits, resulting only in an increase in the total pot.

Finally, Great American suggests in passing that Westchester might have been obligated to pay additional sum for different "occurrences." For the same reasons discussed above, it is unclear how any greater liability on Westchester's part necessarily would support a conclusion that Great America's payment could be applied to the liability, such that a reimbursement obligation would arise. In any event, Great America's motion is expressly limited to the subsidence occurrence and must be denied.

B.  <u>Westchester's motion for summary judgment</u>

Westchester contends that in addition to the issues discussed above, Great America's claims fail as a matter of law because it is simply impossible under this factual scenario to make a determination as to what the settlement payments made by all of the various parties did and did not cover. Because Great American's theory is that the subsidence damages should have been covered only under the 07-08 policy period, the parties agree finding liability will require determining what portion of Webcor's total settlement payment may be allocated to that occurrence.

Great American contends allocation is a relatively simple process of determining what portion of all settled damages constituted the projected cost of addressing the foundation issues. Westchester, in turn, insists the answer is inherently unknowable, given how little is known regarding the amounts contributed by all of the settlement participants, and because the mediation privilege precludes use of much of what is known. Westchester has made a strong showing that it may ultimately not be possible to make a fully grounded and supportable allocation calculation. Westchester has not established, however, that the question can be called against Great American as a matter of law at this juncture. Furthermore, although the parties appear to disagree as to the exact scope of the evidence that will be precluded by the mediation privilege, they have not presented specific, crystalized, disputes sufficient to evaluate whether the privilege will preclude Great American from establishing a viable approach to allocation. Accordingly, while the allocation issue may present an additional challenging hurdle for Great American even if it

1  succeeds in showing how its payment can otherwise be deemed to have covered an obligation
2  owed by Westchester, summary judgment for Westchester is not warranted.

### C. Other matters

Westchester filed a "response" to Zurich's motion for summary judgment, not to oppose it, but to assert some other points. Zurich moves to strike that response as unauthorized and improper, on grounds that it includes content "potentially prejudicial" to Webcor. Neither the Westchester response nor Zurich's motion to strike have affected any of the analysis above. The motion to strike is granted.

Shortly before the hearing, Zurich also sought leave to reply to evidentiary objections Great America lodged in response to Zurich's reply brief. The motion is granted, and the reply is deemed filed.

Finally, the parties submitted a host of sealing motions in connection with briefing on the various motions. While the redactions are not entirely consistent, an adequate effort has been made to limit the amount of material sought to be sealed, and it all appears to meet the criteria for sealing. The motions are therefore granted.

### V. CONCLUSION

Zurich's motion for summary judgment is granted. The remaining substantive motions are denied. The procedural motions listed in section C above are granted.

**IT IS SO ORDERED**.

Dated: February 21, 2023

RICHARD SEEBORG
Chief United States District Judge